## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

MICHAEL A. MILLER,       )
                                  )
Plaintiff,            )
                                  )
vs.                       )    NO. 2:11-CV-217
                                  )
ST. JOSEPH COUNTY, et al.,   )
                                  )
Defendant.            )

## <u>OPINION AND ORDER</u>

This matter is before the Court on the: (1) Verified Motion for Leave to Allow Plaintiff Time to Complete the Filing of Plaintiff's Response to Defendants' Motion for Summary Judgment Instanter, filed on February 22, 2014; and (2) Defendants' Motion for Summary Judgment, filed on October 22, 2013. After due consideration, Plaintiff's motion for leave to complete the filing instanter is **GRANTED**. Accordingly, Plaintiff's February 22 and 23, 2014 filings (DE##'s 41 and 42) are deemed timely filed. Defendants' motion for summary judgment is **GRANTED**. Accordingly, the Clerk is **ORDERED** to close this case.


<u>BACKGROUND</u>

Plaintiff, Michael A. Miller, brought suit against Defendants, alleging he was unlawfully demoted and denied a promotion within

the St. Joseph County Police Department. Miller is an African American male and is an employee of St. Joseph County Police Department ("SJCPD"). Defendant Michael Grzegorek was the Sheriff of St. Joseph County at all times relevant. Defendant Tim Decker is the Chief of the St. Joseph County Police Department. Defendants Terry O'Connor, Phyllis Fields, William Thompson, Jon Hanley and Joseph Zappia are members of the St. Joseph County Sheriff's Merit Board.

On November 4, 2010, Grzegorek was elected as St. Joseph County Sheriff. Miller sought an appointment in Grzegorek's administration, but did not receive one. Instead, he was offered and accepted a job in the Property Room. Miller alleges that he was the victim of several adverse employment actions because of his race and his participation in the 2010 St. Joseph County Sheriff's election, in violation of Title VII of the Civil Rights, the Equal Protection Clause under the Fourteenth Amendment to the U.S. Constitution, the Due Process Clause, the First Amendment as well as a state law claim for intentional infliction of emotional distress.

Defendants have filed a motion for summary judgment, seeking judgment in their favor on all counts.

DISCUSSION

Summary Judgment Standard

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (citing *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)).

A party opposing a properly supported summary judgment motion may not rely on allegations or denials in her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*,

621 F.3d 651, 654 (7th Cir. 2010). If the non-moving party fails to establish the existence of an essential element on which he or she bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). While a non-moving party's failure to respond to summary judgment does not automatically result in judgment for the movant, a court may deem the facts in the moving party's statement of uncontested facts as admitted to the extent the facts are supported by evidence in the record. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012).

Facts

Miller began his employment with the St. Joseph County Police Department ("Department") on April 30, 1981, as a Cadet. Subsequently, he was promoted to Probationary Patrolman on July 7, 1981 and then Corporal on July 7, 1985. (Exh. A). As of his deposition, Miller had served on the Department for 31 years. (Exh. B, Miller Dep. 19). On February 7, 1995, he was promoted to Sergeant, after sitting for a merit system promotional exam. (Miller Dep. 94. However, Miller did not sit for a Lieutenant examination in 2003. (Miller Dep. 9; Exh. C).

Miller was a candidate for Sheriff in the 2010 primary election, and ran against Mike Grzegorek ("Grzegorek"). (Miller Dep. 15). The only time Miller had worked with Grzegorek on the

Department was sometime beginning in the mid-1980's. (Miller Dep. 49). However, he had not worked in the same department with Grzegorek for the past ten years. (Miller Dep. 49). During the primary, Miller and Grzegorek appeared at the same place at various campaign events on occasion. (Miller Dep. 15). Grzegorek never said anything to Miller that ever would convey to him any racial animus. (Miller Dep. 16). During the campaign, Miller and Grzegorek had a discussion at a movie theater about the campaign. During this discussion they talked about Grzegorek's signs being late and what candidates were going to drop out of the race. (Miller Dep. 26). Miller asked Grzegorek to drop out of the race for Sheriff. Miller could not recall whether Grzegorek directly responded to his request. (Miller Dep. 27, 28).

Between the 2010 primary and general election, then current Sheriff, Frank Canarecci, resigned. (Miller Dep. 16). Miller ran for interim Sheriff in a special election, voted on by precinct committee people, and lost. (Miller Dep. 16-18). During this special election, Miller could not identify anyone who displayed racial animus towards him during the special election because no one came up to him and directly said they would not vote for Miller because he was black. (Miller Dep. 21; Miller Aff. ¶ 4).

On November 4, 2010, Miller called Sheriff-Elect Grzegorek to congratulate him on winning the general election. (Miller Dep. 14). Grzegorek said, "thanks for the call and I'll be getting with you

later." (Miller Dep. 14). Miller then called Sheriff-Elect Grzegorek on November 19, 2010. (Miller Dep. 28). Grzegorek told Miller, "he would get with [Miller], [Grzegorek was] out of town, when [he] get[s] back, [they]'ll talk." (Miller Dep. 28). Miller made a third call to Sheriff-Elect Grzegorek on December 1, 2010. (Miller Dep. 29). The December 1, 2010 call was the first time Miller expressed interest in the positions of Assistant Chief and Warden. *Id*. These positions are direct appointments of the Sheriff. (Exh D). No further discussion took place between Miller and Sheriff-Elect Grzegorek regarding those positions. (Miller Dep. 30). On December 4, 2010, Sheriff-Elect Grzegorek announced that he would appoint Robert Boits to Assistant Chief. (Miller Dep. 30-32, 36).

Boits served on the Department from February 1970 until he retired on December 31, 1998. (Exh F-1). Boits served as Chief for approximately thirteen years. (Exh F-2). Grzegorek chose Boits, as Assistant Chief in his administration, because of his experience. (Exh. H, Grzegorek Aff. ¶¶7, 10). Following Boits' appointment, Miller never spoke with Grzegorek about why he chose Boits. (Miller Dep. 38, 41-43). However, Miller believes he was qualified for the Assistant Chief position because he worked in more divisions than Boits, even though he knew Boits had previously served as Chief and had served on the Department "a long time." (Miller Dep. 38, 103-04).

At the time Grzegorek was elected, Julie Lawson ("Lawson") was already serving as Warden of the St. Joseph County Jail. (Grzegorek Aff. ¶9). As such, Grzegorek believed Lawson possessed all of the necessary qualifications to continue on in her role as Warden. *Id*. at ¶¶9-10. Miller is aware that Lawson had even served as Assistant Warden and also had experience working in the Indiana prison system. (Miller Dep. 105). However, Miller's jail experience was limited to running the midnight shift for two and a half years in the old jail, beginning in 1995. (Miller Dep. 31). Since that time, Miller also admits he has had no additional experience with St. Joseph County's new jail or current jail regulations. (Miller Dep. 24-25; 31-32). As a basis for his qualifications as Warden, Miller relies on his number of years with the Department and the various divisions he worked in. (Miller Dep. 32). Miller never spoke with Grzegorek about why he chose Lawson. (Miller Dep. p.43).

In December of 2010, Sheriff-Elect Grzegorek offered Randy Kaps ("Kaps"), a Sergeant in Metro Homicide, a temporary appointment to Captain in charge of the Detective Bureau ("DB").[3] (Kaps Aff. ¶4, Exh. I,). Kaps accepted and proceeded to evaluate DB. Id. at ¶5. Since sometime in the 1970's, the Property Room had accumulated approximately 1,000 guns that should have either been destroyed or returned to owners. *Id*. at ¶6. On or around December 2010, Kaps asked Miller if he would be interested in overseeing the cleanup of the guns in the Property Room. *Id*. at ¶8. Bambi Kanouse

("Kanouse"), the Property Room manager had been unable address the backlog of guns since she was hired in 2007. (Kanouse Dep. 41-42, Exh. E). Kaps believed, based on other officer's accounts, that Miller possessed the necessary organization skills, and would do a good job on the project. (Kaps Aff. ¶¶7-8). In addition, Miller held the rank of Sergeant, and Kaps believed this would benefit the Department with respect to getting cooperation from Indiana State forensic labs. *Id*. at ¶6. At that time, there were only two other Sergeants in DB; one was responsible for maintaining a child molester database; and the other was in charge of internals. *Id*. Kaps viewed Miller as the only available Sergeant. *Id*.

Because Kaps was Miller's supervisor, Miller accepted the position. *Id*. at ¶ 9. By accepting this assignment, there was no change in Miller's pay, benefits, or rank. (Exh. I, Kaps Aff. ¶10; Exh. H, Grzegorek Aff. ¶12). Miller alleges this was a demotion because his transfer to the Evidence/Property Room altered his Senior Sergeant Detective position. (Miller Aff. ¶ 28). Officer Oakley believed the transfer was tantamount to a punishment primarily because the work was performed in the basement. (Oakley Dep. 97-108). However, Miller admits that Kaps never told him he was demoted. (Miller Dep. 75-76; 155). According to Kaps, Miller's duties, with respect to the gun project, included inventorying guns, taking guns to the South Bend Police to have ballistics done, running checks on the guns before they were returned to owners,

tracking down owners, shipping guns to owners, and over seeing a certain company, which tore down the guns. (Miller Dep. 53, 55; Kaps Aff. ¶9). However, all Miller says he did was the counting of guns. (Miller Dep. P. 55).

Neither Chief Decker ("Decker"), Lieutenant Regis Thimons ("Thimons"), or Grzegorek took part in Kaps' decision to ask Miller if he was interested in the project. (Exh. J, Decker Aff. ¶5; Exh. K, Thimons Aff. ¶5; Exh. H, Grzegorek Aff. ¶11). Miller admits he never engaged in any direct discussion, at any time, with Grzegorek regarding his assignment to the Property Room. (Miller Dep. 76). The only time Miller expressed dissatisfaction with the assignment was in a meeting with Kaps and Decker on April 13, 2011. (Miller Dep. 77, 84; Kaps Aff. ¶13; Decker Aff. ¶6). In the meeting, Decker offered to move Miller to the Family Violence Unit. (Miller Dep. 81-82; Decker Aff. ¶7). Miller turned down the offer because he had previously expressed interest in the unit, under a different Sheriff, and was under the impression that the commander of the unit did not want him. (Miller Dep. 82-83). However, when Decker offered Miller the position, he had no knowledge whether the commander was even the same commander. (Miller Dep. 82). According to Miller, neither Kaps nor Decker displayed any racial animus in the meeting with plaintiff. (Miller Dep. 85).

On September 8, 2011, Miller reported to Kaps that the company in charge of tearing down the guns was coming in for its final day.

(Miller Dep. 54). Miller admits that his assignment in the gun project ended around this time. (Miller Dep. 54-55). Kanouse also acknowledges that once the company destroying the guns completed their work, Miller stopped reporting to the Property Room. (Kanouse Dep. 73-74). Following the completion of the gun project, Miller resumed working on cases in the Detective Bureau. (Miller Dep. 181); Kaps Aff. ¶16).

Following the appointments of Assistant Chief and Warden, Miller sought no other positions under Grzegorek. (Miller Dep. 86). However, Miller alleges he was not chosen for temporary administrative appointments based on race. (Miller Dep. p.47-48). Miller states he was qualified for any appointment because he had been on the department for 31 years and was the highest ranking African-American in the Department. *Id.* Miller never discussed any of Grzegorek's appointments with Grzegorek. (Miller Dep. 38). Sheriff Grzegorek has considered, and appointed African-Americans, for temporary administrative appointments. (Grzegorek Aff. ¶¶15-16).

In 2011, the Sheriff offered Gary Fields ("Fields"), an African-American school resource officer on the Department, a temporary appointment, but did he did not accept. *Id.* at ¶15. Additionally, in 2012, Cynthia Guest ("Guest"), an African-American Corporal on the Department, was promoted to the temporary rank of Sergeant on January 10, 2012. *Id.* at ¶16. Guest expressed interest

and the Sheriff agreed she should be appointed because she deserved to be appointed. *Id*. Under past sheriff administrations, several other African-Americans on the Department have received temporary appointments. *Id*. at ¶13. These individuals include: (1) Frank Anderson appointed Captain in 2003 to command the DB until his retirement on November 30, 2010; (2) Cynthia Murdock appointed Lieutenant on March 2, 2004 until she retired on January 30, 2008; and (3) Norval Williams, as Assistant Chief, under Sheriff Seniff. *Id*.

On January 24, 2011, Miller filed a race based discrimination claim with the EEOC. (Exh. G. p.59). Miller claims that from November 4, 2010, until January 11, 2011, he was never approached about five (5) vacant positions filled by Sheriff Grzegorek; the positions of Assistant Chief, Captain, Lieutenant (2), and Warden. *Id*. However, Miller specifically states in his EEOC claim that he only expressed interest in the position of Assistant Chief and Warden. *Id*. In addition, Miller claimed that his assignment to the property room was degrading. *Id*. The EEOC issued a finding of no probable cause and sent a Dismissal and Notice of Rights to the plaintiff on March 23, 2011. *Id*. Miller, subsequently, filed suit on July 23, 2011. *Id*. He has also alleged intentional infliction of emotional distress. Doc. 5, ¶82. However, Miller never served a tort claim notice. (Grzegorek Aff. ¶17).

The Title VII, Section 1981 and Section 1983
claims must be dismissed because there is no
<u>evidence that Defendants engaged in race discrimination</u>

Miller alleges that he was intentionally discriminated against on the basis of his race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5, in violation of his equal rights under the law, in violation of 42 U.S.C. § 1981, and claims his rights were violated under color of law, in violation of 42 U.S.C. § 1983. Because Title VII, Section 1981 and Section 1983 claims are analyzed in the same manner, these claims will be addressed simultaneously. *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 337-38 (7th Cir. 2002); *Salas v. Wisconsin Dept. Of Corrections*, 493 F.3d 913, 926 (7th Cir. 2007). There are two ways a race discrimination claim can be proven. There is a direct and an indirect method. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 938 (7th Cir. 2003).

<u>Direct Method</u>

Under the direct method a plaintiff must "show either through direct or circumstantial evidence that the employer's decision to take the adverse job action was motivated by an impermissible purpose." *Id.* at 938-939. Direct evidence consists of either an outright admission by the decision maker that the challenged action was undertaken because of the [plaintiff's race] or a convincing mosaic of circumstantial evidence . . . that point[s] directly to

-12-

a discriminatory reason for the employer's action. *Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1071 (7th Cir. 2012)(citations and quotations omitted).   There is no such outright admission in this case.

Direct evidence can also be circumstantial evidence from which a trier of fact could reasonably infer that Defendants discriminated against him because of his race.   To create a convincing mosaic, a plaintiff can rely on "three different types of circumstantial evidence of intentional discrimination: (1) suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) evidence that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the plaintiff was qualified for the job in question but was passed over in favor of a person outside the protected class and that the employer's stated reason was a pretext for discrimination." *Id.* (citations and footnotes omitted).  Ultimately, the circumstantial evidence a plaintiff presents "must point directly to a discriminatory reason for the employer's action" and be "directly related to the employment decision." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003); *Venturelli v. ARC Cmty. Services, Inc.,* 350 F.3d 592, 602 (7th Cir. 2003).

In reviewing the record, there is no circumstantial evidence that directly points to a discriminatory reason for Miller not getting the requested appointments or being assigned to the Property Room. And, while Miller continuously asserts he was assigned to the Property Room, the evidence shows Miller was asked to and agreed to work in the Property Room. Tellingly, Miller points to no direct evidence of discrimination. Thus, there is no direct evidence that Miller was discriminated based on his race.

Indirect Method

When using the indirect method a plaintiff must first make a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To do this, the plaintiff must show that 1) he belongs to a protected class 2) he was meeting his employer's legitimate performance expectations 3) he suffered an adverse employment action and 4) other similarly situated employees who were not members of the protected class were treated more favorably. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007).

If the plaintiff is able to make out a prima facie case the burden then shifts to the defendant to make a legitimate, nondiscriminatory reason for the adverse action. *McDonnell Douglas*, 411 U.S. 792 at 802. If the defendant meets this burden then the plaintiff is afforded a chance to show that the

defendant's nondiscriminatory reason is mere pretext for discrimination. *Id.* at 804. To show pretext the plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence." *Fane*, 480 F.3d 534 at 541. While the burden does shift between the plaintiff and the defendant, the ultimate burden of persuasion is always with the plaintiff. *Id.* at 538.

Even assuming Miller could make out a prima facie case -which is highly questionable-, it is clear that Grzegorek had a legitimate, non-discriminatory reason for his appointing Boits and Lawson over Miller. Simply put, Boits and Lawson had as much, or more, experience than Miller. And, Miller has failed to provide any evidence that would suggest Grzegorek's decision was in any way pretextual.

Unfortunately, Miller is under the belief that he is not required to prove discrimination under either the direct or indirect method. (See DE# 39 p. 41, stating, "[t]herefore, Miller [sic] not required to prove intentional race discrimination under the direct method or McDonnell Douglas burden-shifting method of proof."). As such, he does not address Defendants' arguments under either of these methods at all. Instead, Miller relies on Judge Wood's concurring opinion in *Coleman v. Donahoe*, where she calls for a change in the pre-trial methods of proof and calls for

collapsing the direct and indirect methods into one, more flexible model. 667 F.3d 835 (7th Cir. 2012). As such, Plaintiff claims he is allowed to prove race discrimination under "a more straightforward analysis of discriminatory causation." However, even if her were permitted to bypass the traditional methods of proof and use a discriminatory causation analysis, Miller fails to provide any such analysis. Instead, Plaintiff simply puts forward the following scant facts:

> [Miller] has proffered sufficient evidence of a discriminatory motivation that he suffered a materially adverse employment action, demotion after running for Sheriff against Grzegorek and while doing so asked Grzegorek to drop out of the race and support him. After the election, which Grzegorek won, but before Grzegorek was sworn into office, Miller had been reassigned and transferred into the Property Room located in the County Jail. After the election but before, Grzegorek sworn-in Miller personally requested that Sheriff Grzegorek appoint him to either the position of Assistant Chief, St. Joseph County Police Department or Warden of the St. Joseph County Jail.

(DE# 39, pp. 41-42).

Unfortunately, for Miller, he must establish his discrimination claim through either the direct or indirect method. He as failed to even attempt to satisfy either. Moreover, even if Judge Wood's concurrence was the law of this Circuit, Plaintiff has failed to prove that there exists a genuine issue of material fact even under a discriminatory causation analysis. See e.g. *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 737 (7th Cir. 2013)(noting that there is little "discernible difference" in the direct method and

discriminatory causation).

While Miller has recited a few facts, he has wholly failed to perform any of the discriminatory causation analysis he references. This failure to put his scant facts into any legal context is woefully insufficient to create a triable issue under any method of proof. In fact, Miller's legal analysis of his race discrimination claims is so underdeveloped, it is actually nonexistent.


Miller's Due Process claim must be dismissed
because he has not suffered a constitutional deprivation.

Miller asserts his constitutional rights under the Due Process Clause were violated when he was assigned to the Property Room.[1] The Due Process Clause of the Fourteenth Amendment provides that no state "shall deprive any person of life, liberty, or property without the due process of law." U.S. Const. Amend. 14. Non-pecuniary losses, though, "do not implicate the Constitution." *Deen ve. Darosa, Kent Kettlekamp*, 414 F.3d 731, 734 (7th Cir. 2005). It is undisputed that Miller retained his pay, rank, and seniority at all times, even during his time working in the Property Room. Because working in the Property Room did not cause any pecuniary loss, Miller's assignment to the Property Room cannot constitute a due process violation.[2]

---

[1] In fact, his brief says no more than that. (DE# 39, p. 42).

[2] Miller also ignores that fact that he accepted the assignment to the Property Room.

Miller's First Amendment claim must be dismissed because there is no evidence that Miller's participation in the <u>2010 election was a motivating factor for the Sheriff's decisions.</u>

Miller argues that his participation in the 2010 Sheriff's Primary election was a substantial or motivating factor in his not being appointed to Assistant Chief or Warden and in his being assigned to the Property Room. Politically motivated hiring, firing, or transferring of government employees – with certain exceptions for policy making positions and for employees having a confidential relationship with a superior – can be a violation of the First Amendment to the U.S. Constitution. *Hall v. Babb*, 389 F.3d 758, 762 (7th Cir. 2004). To make out a prima facie case of this violation, a plaintiff must show, "first, that the plaintiff's conduct was constitutionally protected, and second, that the protected conduct was a substantial or motivating factor in the employment decision." *Id*.

While it is true that Miller's participation in the 2010 Primary election is protected activity, there is no evidence that Miller was assigned to the Property Room or passed over for any appointments based on that participation. There are no direct admissions or any other circumstantial evidence that could lead the Court – or a jury- to that conclusion.

Miller's conspiracy claim must be dismissed
because there is no evidence the that Defendants
<u>conspired to deprive him of any constitutional rights.</u>

Miller claims his constitutional rights, under U.S.C. sections 1983 and 1985, were violated when Grzegorek, Kaps, Decker (a private individual-independent contractor) and Thimons conspired to racially discriminate against him with regards to promotions and assigning to the Property Room. Miller's full argument is, "During [sic] meeting attended by Grzegorek, Kaps, Decker and Thimons [sic] reached an understanding that Miller would be assigned and to the Property Room." (DE #39, p. 42).

To establish such a conspiracy theory, Miller must demonstrate that "(1) a state official and private individual(s) reached an understanding to deprive him of his constitutional rights; and (2) those individual(s) were 'willful participant[s] in joining activity with the state or its agents.'" *Williams v. Seniff*, 342 F.3d 774, 787 (7th Cir. 2003)(citations omitted).

While Miller alleged a conspiracy, there is no evidence that any such conspiracy existed. At most, Miller points to a December 17, 2010, meeting, which included Grzegorek, Kaps and Thimons, where Thimons allegedly called Miller "untrainable." However, that sole comment does nothing to show that these individuals reached an understanding to deprive Miller of any of his constitutional rights.

Section 1983 claims against St. Joseph County, Sheriff
<u>and St. Joseph County Police Department must be dismissed.</u>

Plaintiffs have brought section 1983 claims against the St. Joseph County Police Department, St. Joseph County, Sheriff, and Merit Board. Defendants maintain that they are entitled to summary judgment on each of these claims.

To start, Defendants contend that no section 1983 claim can be maintained against the St. Joseph County Police Department because it is merely a municipal department and not a suable entity. Defendants are right in this contention. *Gillespie v. City of Indianapolis*, 13 F.Supp.2d 811, 816 (S.D. Ind. 1998), aff'd 185 F.3d 693 (7th Cir. 1999); *Slay v. Marion County Sheriff's Dept.*, 603 N.E.2d 877, 887 (Ind. Ct. App. 1992). Indeed, Plaintiff does not argue otherwise and, therefore, Miller has waived any argument to the contrary. See *Laborers' Intern. Union of North America v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999).

Next, St. Joseph County argues it is not a proper defendant because the official policy or customs are based on the Sheriff and the Merit Board's role as the final policymaking authority under state law. Miller named St. Joseph County as a defendant and, thus, is suing the Board of Commissioners of St. Joseph County, since the Board of Commissioners is the executive of the county. *Waldrip v. Waldrip*, 976 N.E.2d 102, 118 (Ind. App. 2012). Statutorily, the Board of Commissioners is responsible for keeping a jail open and in good repair. Ind. Code § 36-2-2-24(a). In

Indiana, the sheriff's office is an independent office established under Indiana Constitution. Ind. Const. Art. 6 § 2. Further, "the law is well-settled that county commissioners do not have control over the acts of a sheriff." *Waldrip*, 976 N.E.2d at 119 (quoting *Robins v. Harris*, 740 N.E.2d 914, 919 (Ind. App. 2000). Accordingly, St. Joseph County is entitled to summary judgment on plaintiff's *Monell* claim.

Finally, Defendants contend that the Sheriff or Merit Board are entitled to summary judgment because Miller has failed to show that any policies or customs of the Sheriff or Merit Board caused Miller's alleged deprivations. Under the familiar case of *Monell v. New York City Department of Social Services*, 436 U.S. 658, 694 (1978), the Supreme Court determined that municipalities and other local governmental units, such as the St. Joseph County Sheriff or Merit Board, could only be sued under section 1983 where the "policy or custom" of the entity caused a constitutional deprivation.

There has been no evidence in this case to establish that Miller's alleged injury came at the hands of any sort of "custom or policy" that would make either the Sheriff or Merit Board liable in this case. Nevertheless, Plaintiff fails to address this in his response and, again, this Court finds such any argument to the contrary waived. *Caruso*, 197 F.3d at 1197.

Title VII disparate impact claim against
Sheriff and Merit Board must be dismissed
because there is no evidence that the complained
of policies and practices resulted in a disparate impact.

Miller points to a number of policies and practices he believes causes a disparate impact on African-American merit officers, including:

a.    Failure by the Sheriff and Merit Board to set schedule of annual examinations.

b.    Failure of the Merit Board to approve the design and administration of examinations for promotion.

c.    The failure of defendants to conduct written promotional examinations annually for ranks below Captain.

d.    Failure to establish and utilize eligibility pool/list for filling department vacancies.

e.    Sheriff with approval of the Sheriff's Merit Board filled open merit officer positions through temporary appointments based on subjective unpublished criteria.

f.    Sheriff and Merit Board failure to publicly post within the Department notices that vacancies existed in one or more ranked positions.

g.    Requirement that each candidate in eligibility pool reapply each year for re-examination.

h.    Failure of Merit Board to enforce Qualifications for Rank provision of the Manual.

i.    Authority of Merit Board to return an officer appointed to rank to his/her former rank without notice or hearing.

j.    Adoption by Sheriff and Sheriff's Merit Board of policy, practice/custom of "no testing temporary appointment only".

k.    That the practices, policies and customs of defendants over the years has resulted in the promotion or appointment of zero African-American to command positions since 1998 until after Plaintiff filed suit.

Miller has also provided, which this Court has not recounted, a number of temporary appointments made by Sheriff Grzegorek over the past few years, apparently in an effort to establish that the above policies resulted in a disparate impact on African-American merit officers. Simply put, Miller recounts that 17 of Sheriff Grzegorek's 18 temporary appointments were white men. (DE# 42-1, pp. 3-4). However, merely listing a number of employment practices along with a racial imbalance of temporary appointments is not sufficient to make out a prima facie case of disparate impact. *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 657 (1989).

Miller will "also have to demonstrate that the disparity [he] complains of is the result of one or more of the employment practices that [he is] attacking here, specifically showing that each challenged practice has a significant disparate impact on employment opportunities for whites and nonwhites. To hold otherwise would result in employers being potentially liable for 'the myriad of innocent causes that may lead to statistical imbalances in the composition of their workforces.'" *Id.(quoting Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 992 (1988)). This was never done. The problem is that Miller's arguments are not developed. Miller has not specifically shown that any of the complained of practices had a significant disparate impact on non-whites. As such, his disparate impact claims fail.

Miller's intentional infliction of emotional distress claim must be dismissed because there is no evidence of outrageous conduct and <u>Miller failed to provide the requisite tort claim notice.</u>

Intentional infliction of emotional distress under Indiana law is the intent to harm someone emotionally and requires that the defendant: (1) engage in extreme and outrageous conduct; (2) which intentionally or recklessly; (3) causes; (4) severe emotional distress to another. *Curry v. Whitaker*, 943 N.E.2d 354, 361 (Ind. Ct. App. 2011) (affirming summary judgment for defendants against intentional infliction claim). The requirements to prove this tort are rigorous and it is found only when the conduct "exceeds all bounds typically tolerated by a decent society and causes mental distress of a very serious kind." *Curry*, 943 N.E.2d at 361. Any such claim against a county requires notice withing 180 days after the loss occurs. Ind. Code § 34-13-3-8(a).

Not only is there nothing in the record to support such a claim, but Miller failed to serve a notice to the Sheriff within the 180 day notice period after his alleged loss occurred. The claim cannot survive the summary judgment stage for both reasons.

<u>CONCLUSION</u>

After due consideration, Plaintiff's motion for leave to complete the filing instanter is **GRANTED**. Accordingly, Plaintiff's February 22 and 23, 2014 filings (DE##'s 41 and 42) are deemed timely filed. And, for the reasons set forth above, Defendants'

summary judgment is **GRANTED**.  Accordingly, the Clerk is **ORDERED** to close this case.



**DATED:  July 30, 2014**                    **/s/RUDY LOZANO, Judge**
                                             **United States District Court**